UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
                                                                 :
**JIN CHENG LIN**,                                               :
                                                                 :
                                    Petitioner,                  :
                                                                 :    **MEMORANDUM DECISION AND**
                                                                 :    **ORDER**
                  – against –                                    :
                                                                 :    18-CV-5005 (AMD)
                                                                 :
**JAMIE LAMANNA**,                                               :
                                                                 :
                                    Respondent.                  :
--------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The *pro se* petitioner, currently incarcerated at Green Haven Correctional Facility,

petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  A jury

convicted the petitioner of six counts of Murder in the First Degree, six counts of Murder in the

Second Degree, Burglary in the First Degree and Attempted Robbery in the First Degree.  The

petitioner reasserts the claims he raised on direct appeal and in his *pro se* collateral challenges—

that his trial and appellate lawyers were ineffective, that the testimony of a DNA expert violated

the Confrontation Clause, and that the prosecution withheld exculpatory evidence in violation of

*Brady v. Maryland*.  For the reasons that follow, the petition is denied.

## BACKGROUND[1]

### I.    Overview

On May 12, 2005, the petitioner murdered his ex-girlfriend Cho Man Ng (also known as

"Sharon") and her brother, Sek Man Ng (also known as "Simon"), by stabbing them to death.

On the day of the murder, the petitioner went to Sharon and Simon's apartment, where he held

---

[1] Because the petitioner was convicted, I summarize the facts in the light most favorable to the verdict.
*See United States v. Wasylyshyn*, 979 F.3d 165, 169 (2d Cir. 2020) (citing *Garbutt v. Conway*, 668 F.3d
79, 80 (2d Cir. 2012)).

Simon at knifepoint, bound him with duct tape, and searched the apartment for money. The petitioner then turned off the lights and waited for Sharon to arrive. When she did, he held a knife to her neck and forced her to bind herself with tape. Simon tried to get free, and the petitioner stabbed him repeatedly, including in his neck. The petitioner then stabbed Sharon in her face, neck, back, and abdomen, partially disemboweling her. The petitioner threw the knife in the toilet, and fled.

The petitioner went to trial before the Honorable Gregory Lasak. (ECF No. 11-6 at 94.) He was convicted as outlined above. (T. Tr. 1959-62.)[2]

## II.    Pretrial Hearing

Prior to trial, the petitioner moved to suppress his statements to the police. The Honorable Randall Eng presided over a hearing on that motion, which took place in five sessions—in August and October of 2006, and in January, February and March of 2007. (ECF No. 11-5 at 1, 46, 140, 170; ECF No. 11-6 at 17.) Seven detectives testified at the hearing, as did a Criminal Justice Agency ("CJA") representative and a corrections officer. (ECF No. 11-5 at 1-264; ECF No. 11-6 at 1-47.) The hearing established the following:

Detectives Bernard Marshall and Daniel Schindlar were assigned to investigate the murders of Sharon and Simon Ng. As part of that investigation, they went to the petitioner's apartment on the morning of May 13, 2005, and asked if he would come to the 107th precinct. (ECF No. 11-5 at 175; ECF No. 11-6 at 43-46.) At that point, the petitioner was not a suspect, but was one of many witnesses being interviewed as part of the investigation. (*See* ECF No. 11-5 at 63.) The petitioner agreed, and the detectives drove him to the precinct, where he was interviewed multiple times. (*Id*.)

---

[2] Parenthetical references containing "T. Tr." refer to the trial transcript.

Detective Phil Wong interviewed the petitioner six or seven times that day, each time for about 10 to 15 minutes. (*Id.* at 49-50, 68, 70.) The petitioner told him that he dated Sharon for five years, but they had broken up a year earlier because Sharon was "cheating" on him with Kevin Lee, a married man. (*Id.* at 52.) On May 12, 2005, the petitioner went to Sharon's apartment around 4:00 or 4:30 p.m., and gave Simon a gift for Sharon—two squirrels made out of seashells. (*Id.* at 53.) The petitioner claimed that he left after about 30 minutes and went home, where he stayed for the rest of the night. (*Id.* at 53-54.) At other points in the interview, the petitioner said he went to Sharon's apartment to get her parents' contact information, to have sex with her, and because he did not want anyone to think she was promiscuous. (*Id.* at 54.)

Other detectives were also present at various times throughout the day, including Detective Kevin Hui and Detective Jae Shim. (*Id.* at 5-6.) The petitioner was speaking to the detectives in both English and Cantonese. (*Id.* at 7.) At one point, the petitioner asked in Cantonese to talk to Detective Hui privately. (*Id.* at 10, 27.) When the other detectives left, Detective Hui told the petitioner not to waste his time, and that "based on the cases that [he'd] done in the past . . . a lot of suspects get away . . . they leave the country and if you know who did it, you should tell us." (ECF No. 11-5 at 10.) The petitioner "guaranteed that the guy is not going to leave." (*Id.* at 11.) He also said, "[W]hat if I left, you know, and two minutes later rang the doorbell again. [Simon] wouldn't come back down to check who it was." (*Id.* at 11.) The petitioner asked Detective Hui if he could work out a deal, to which the detective responded that he was not the case officer. (*Id.*) As Detective Hui left the interview room, the petitioner said that he did not want to "'squat' . . . until he's 60 . . . maybe until 40."[3] (*Id.* at 12.)

---

[3] "Squat" is a slang term for being in prison. (ECF No. 11-5 at 12-13.)

After Detective Hui told the other detectives what the petitioner said, (*id.* at 13, 185), Detectives Marshall and Schindlar decided to take the petitioner home, (*id.* at 181). They drove him to his house, and asked if he would return the next day; the petitioner agreed. (*Id.*)

The next day, the detectives picked up the petitioner at around 11:00 a.m. (*Id.* at 186.) Shortly after they arrived at the precinct, Detective Marshall advised the petitioner of his rights in English using a *Miranda* form. (*Id.* at 188, 190-91.) After giving each warning, Detective Marshall asked the petitioner if he understood; the petitioner checked "yes" after each question, and signed the form. (*Id.* at 190.) In the approximately two hours that followed, the petitioner said that he went to Sharon's house on the afternoon of May 12 to give her shell figurines, and returned home by 5:00 p.m. (*Id.* at 191-92.) Detective Marshall, who learned during a break that Sharon had the figurines for weeks before the murders, interviewed the petitioner again for about two and a half hours with an hour break. (*Id.* at 93, 196-97.) At about 9:00 p.m., the petitioner completed a written statement:

> I have lived in the US for 9 year. I went to Cardoza High School. I left school in the 11 grade. Started to work Chinese restaurant and bakery in March I came back from China. I was working at Dot Ming Ming Dot in Connecticut near Mass. While working during the 2 weeks and April 10th to 23rd I met Gong. Gong an friend of one of the drivers we spoke many time. He told me about a house have a lot of money about $400,000 dollars. And he showed me a silver gun and asked if I know where to get money for more guns and the car. I said yes I know a house in Flushing with money. I told him the I didn't want to go into the house to get the money so I give you a address I told him the street and her car he call me on my brother phone and asked how many people live in the building and ask how -- 917-715-0221 and ask how many people live in the building and how he could get in. I told him to call me at home 718-661-2039 so he call me at home during the last week of April or the first week in May again ask him ask how he can get in Sharon house. I told him the on the 12th of May he asked what time. I told him around 4 in the afternoon. He ask if he could go in with me. I said no I told him I was leave in about half hour or an hour. On Thursday, May 12th at about 4 in the afternoon I went to

> Sharon house. Simon answer the door and let me in to he
> apartment. I talk to Simon for a while. And that left about half hour
> later. As I left I walk past a Fukanese man talking on a cell phone
> in standing next to the front door. As I walked away I look back
> and watch the man go in the building. I want home and wait for
> Gong to call me. He never called. I want to sleep about 12 AM. I
> was told that Sharon and Simon were killed by the police the next
> morning. I never ask for money. He said he would give me money
> from the other house in New Hampshire with a lot of money.

(*Id.* at 198-200.)

Detective Marshall told the petitioner that he was under arrest, and left the interview

room to prepare an arrest form.  (*Id.* at 200, 245.)  At around 5:00 a.m., the petitioner knocked on

the window of the interview room, and asked to speak to Detective Marshall.  (*Id.* at 202.)  The

petitioner then gave an additional written statement:

> I never know them will kill Sharon and Simon. I thought them go inside
> with the guns because he -- he till me before he did the something in
> profession and he sewed me the guns before. After it they suppose give me
> the phone call. And me went to know what it happen too. How many they
> get. And how they are because I very went to know they don't get any
> hurt. But they did not give me the phone call. So I'm very scared when I
> hear Sharon and Simon dead. This is why I lied to the PRC at the first
> time. I told them this place because they said when I help them this time to
> get the money they will pay me thousands question mark with 4 zeros in
> the other one because I know I am going to going to China I will need this
> money.

(*Id.* at 204.)

Detective William Schmittgall arrived at the precinct, and he and Detective Marshall

interviewed the petitioner at about 11:00 a.m.  (*Id.* at 206.)  Detective Schmittgall reminded the

petitioner he had the right to speak to a lawyer, and the petitioner responded that he wanted to

explain things.  (*Id.* at 96, 217.)  The detectives interviewed the plaintiff until around 2:00 p.m.

(*Id.* at 97, 206.)  The detectives went to the victims' apartment, and also got food for the

petitioner.  (*Id.* at 97-98, 206.)

The detectives also learned that around the time the petitioner said he was at the apartment, Simon made a blog post on a website called Xanga. (*Id.* at 98-99, 208.) Simon wrote that his sister's boyfriend was in the apartment, looking for fishing poles, and that Simon had told him to wait downstairs, but that he was upstairs and had been walking through the apartment for the last hour smoking cigarettes. (*Id.* at 99.) Accordingly, the detectives interviewed the petitioner again. (*Id.* at 100, 209-10.) They told him that Simon had survived, and told them that the petitioner came to the apartment not to give Sharon a gift, but to get something. (*Id.* at 100-01.) Detective Schmittgall then wrote the words "fishing poles" on a piece of paper. (*Id.* at 101.) The petitioner read it, and started crying. (*Id.* at 101-02, 210.) After about 15 or 20 minutes, the petitioner wrote the following statement:

> [O]n Thursday, May 12, 2005 around 4 PM, I went to Sharon and Simon house rang the door bell. Simon came down and open the door and I ask them ask them the fishing poles. Follow upstairs into the apartment and talk to the Simon. Cigarette -- cigetette (ph). I get the knife from the kitchen and go to Simon room. With tape I get from the kitchen. I hold the knife to he neck from behind. And to tape himself and tape his eye, mouth, hand, leg. I told him to set the bed. I look for the money from Simons room and Sharons room. I couldn't find the money so is I want to the living room smoke cigetette (ph) and with for Sharon. That Sharon come home. I come from behind and put the knife to the neck and I turned the light off before she come home so she couldn't see me. I told her to tape herself with the white tape that Simon go crazy and hands free and his come out of the room. And I go crazy and stab him in the neck and stomach. He falls down to the floor and closed to the doors. That go back to Sharons room and she be crazy too so I'm crazy and stab her stomach and falls down on the floor closed to the makeup table that I scared that throw the knife to the toilet. That I look back and see Sharon she room is closed and I ran home. Change the shirt and jeans and that watch TV and take show and went to sleep.

(*Id.* at 211-12.)

Detective Marshall and Detective John Warner questioned the petitioner again. (*Id.* at 143, 214.)  The petitioner gave two more written statements, in question-answer form—the detectives wrote the questions, and the petitioner wrote his answers below the questions. (*Id.* at 214-15.)

Statement dated May 16, 2005, 1:30 a.m.:

Q: What clothes was Simon wearing?
A: Simon wearing white T-shirt and silver short pants.

Q: What is Sharon wearing?
A: Wearing a jacket.

Q: What was Simon doing while you were walking around the apartment?
A: Simon doing the homework, HW, by the computer.

Q: What were you wearing on May 12, 2005.
A: I wearing on May 12, 2005 the pants and shoes I have on now and the black long sleeve shirt.

Q: Where is that shirt now?
A: The shirt now is in the closet on the box.

Q: Where did you get the knife from?
A: I get the knife from the kitchen on the table with the long knife on the cutting board.

Q: What color is the tape on Simon?
A: The color on Simon is silver.

(*Id.* at 214.)

Statement dated May 16, 2005, 2:00 a.m.:

Q: How old were you when came to the USA?
A: 14 year.
Q: What junior high school did you attend?
A: MS 74, 7th, 8th grade.
Q: What high school did you attend?
A: Benjamin Cardoza.
Q: What grade were you in when you left school?
A: 11 grade.

(*Id.* at 216.)

An assistant district attorney came to the precinct later that morning and began a taped interview of the petitioner.  (*Id.* at 250.)  When she advised the petitioner of his constitutional rights, the petitioner asked for a lawyer, and the interview ended.  (*Id.* at 250-51.)

The detectives testified that the petitioner was not handcuffed during questioning, that he rested, used the bathroom, smoked cigarettes, and ate and drank.  (*Id.* at 56-57, 90-91, 144, 182-83, 202, 216-17.)  He did not ask for a lawyer.  (*Id.* at 182, 216.)  The detectives understood the petitioner when he spoke English.  He did not appear to have any difficulty understanding the detectives' questions, and his answers were responsive to their questions.  (*Id.* at 55-56, 144-45, 190-91.)

Detective Thomas Chin testified that he arrested the petitioner in 1998, and read him his rights in both English and Cantonese.  (ECF No. 11-5 at 156-64; ECF No. 11-6 at 1-11.)  Kallie Cothalis, a CJA employee, testified that the petitioner had an intake interview with a CJA representative who completed a form indicating that the interview took place in English.  (ECF No. 11-6 at 18-31.)  Finally, Robert Reed, a corrections officer at Rikers Island, where the petitioner was detained, testified that he spoke to the petitioner in English.  (*Id.* at 32-38.)

Judge Eng denied the petitioner's motion to suppress his statements.  He found that the petitioner's waiver of his rights was knowing; the petitioner attended high school in the United States for several years, conversed with officers in English, and was advised of his rights in English and Cantonese in 1998.  (*See* ECF No. 11-1 at 13.)  The judge also determined that the petitioner's statements were voluntary; he was advised of his rights, given food, water, and cigarette, bathroom and rest breaks, and each questioning session was relatively brief.  (*See id.* at 14.)

III.   **Trial**

   A.   The Prosecution's Case

   The prosecution called 22 witnesses, including the detectives who testified at the pretrial

hearing.  (T. Tr. 501-1679.)  The evidence established the following facts:

   21-year-old Cho Man Ng (also known as "Sharon") and her brother, 19-year-old Sek

Man Ng (also known as "Simon"), shared an apartment in Queens.  (T. Tr. 593.)  The petitioner

dated Sharon for about five years.  (T. Tr. 775-77.)  They broke up in 2004 after the petitioner

learned that Sharon was also seeing the petitioner's friend, Kevin Lee, who was married.  (T. Tr.

640-45, 775-77.)

   In a blog post dated May 12, 2005 at 5:05 p.m., Simon wrote:

> Anyway, today has been weird.  At three some guy rang the bell.
> I went down and recognized it was my sister's former boyfriends.
> He told me he wants to get his fishing poles back.  I told him to
> wait downstairs while I get them for him.  While I was searching
> them, he is already in the house.  He is here right now smoking,
> walking all around the house with his shoes on which, BTW, I just
> washed the floor two days ago.  Hopefully he will leave soon.

(ECF No. 11-6 at 87-88; ECF No. 11-7 at 240.)

   That same night, Sharon had dinner in Chinatown with Kevin Lee.  He dropped her off at

her apartment shortly after 9:00 p.m., and then drove home.  (T. Tr. 647-50.)

   After he got home, Kevin called Sharon several times, but she did not answer until

around 9:25 p.m. (T. Tr. 650-51.)  Her voice was "[s]o weak."  (T. Tr. 651.)  She told him, "I'm

so dizzy.  Someone's in the house."  (*Id.*)  Sharon also called Vincent Tsang at around 9:30 p.m.,

and told him, "somebody is at my apartment . . . a lot of blood[;]" she asked Vincent to call 911.

(T. Tr. 832, 835.)  Both Kevin and Vincent went to Sharon's apartment.  (T. Tr. 652-53, 836.)

Kevin arrived first.  The apartment door was open, (T. Tr. 652), and there was blood on the wall.

Someone was lying on the floor of Simon's room.  (T. Tr. 652-53.)  Sharon's door was closed,

and there was blood on the knob.  (T. Tr. 694-95.)  Kevin was "freak[ing] out," and called the
police.  (T. Tr. 653, 673.)

Retired Police Officer Brian Deachman was one of the first officers to arrive at the
apartment building.[4]  The lights were off in much of the apartment, and there was blood in the
hallway.  (T. Tr. 550-51.)  The officer went into the bedroom, and saw Simon lying on the floor,
covered in blood from multiple stab wounds.  (T. Tr. 551.)  His legs were bound with duct tape,
and he was partially covered by a blanket.  (T. Tr. 551-52.)  The officer heard someone moaning
in another room.  (T. Tr. 552.)  He went to Sharon's room, which was locked.  (*Id.*)  He and his
partner kicked the door open, and found Sharon lying on the ground, "semiconscious."  (*Id.*)
Sharon had "many stab wounds, lots of blood."  (*Id.*)  She had a stab wound to her throat, her
stomach was "cut open," and her intestines were "on the floor."  (*Id.*)  Officer Deachman knelt
down, and asked, "Who did this to you?"  (T. Tr. 553.)  Sharon "was trying to speak, but she
couldn't get the words out."  (*Id.*)  At one point, she said, very slowly, "I cannot breathe."  (*Id.*)

EMTs arrived shortly thereafter, and pronounced Simon dead.  (T. Tr. 554.)  The EMTs
took Sharon to the hospital, where the trauma team took over, but she died shortly thereafter.  (T.
Tr. 507-08, 554.)  One of the nurses noticed hair and tissue under Sharon's fingernails, so she
"bagged" her hands by putting paper bags on her hands and securing them with tape.  (T. Tr.
537.)

Detectives began their investigation.  Crime scene detectives photographed the murder
scene, and vouchered evidence including a knife that was in the toilet, a flashlight from Simon's
bedroom, and roll of duct tape and masking tape.  (T. Tr. 1422-60.)  Other detectives interviewed

---

[4] Other officers handcuffed Kevin and Vincent.  (T. Tr. 656.)  Detectives later executed a search warrant
at Kevin's apartment.  (T. Tr. 661.)

multiple witnesses at the 107th precinct, including Kevin Lee, Vincent Tsang, the defendant's brother— Jin Zhan Lin—and the defendant.  (T. Tr. 716, 770, 805, 846.)  Four of the detectives who testified at the pretrial suppression hearing gave essentially the same testimony they gave at the hearing about their interactions with the petitioner and the statements he made.[5]  (T. Tr. 712-814, 869-1105, 1121-88.)  In addition, Detective Marshall testified that the petitioner had scratches on his forehead; the petitioner told him that he hit his forehead on his kitchen table.  (T. Tr. 881.)

Dr. Henry Nields performed the autopsies on Simon and Sharon.  (T. Tr. 1613-14, 1639.)  Simon had multiple stab wounds, including a wound to the front of his neck that penetrated five inches, perforating his thyroid, cutting through his arteries, and hitting the vertebrae.  (T. Tr. 1619-24.)  He had sharp force and blunt force injuries to his head, including an incised wound on his left cheek, three incised wounds to his chin and a laceration on his scalp.  (T. Tr. 1619-20.)  He also had four incised wounds to his right hand and an abrasion to the back of his right ring finger.  (T. Tr. 1624.)  There was duct tape on his legs, as well as what appeared to be adhesive residue from tape on his left wrist and on the sides of his neck.[6]  (T. Tr. 1618.)

Sharon also had multiple stab wounds, including five stab wounds to her face, three to her neck, and six to her torso, including one to her abdomen that penetrated eight inches, perforating her large and small intestines.  (T. Tr. 1639-42.)  She also had stab wounds to her back.  (T. Tr. 1642-43.)  Both victims' stab wounds were consistent with the knife recovered from the apartment; the blunt trauma injuries were consistent with the flashlight found in Simon's room.  (T. Tr. 1653, 1657.)  Simon died from sharp force injuries to his neck and upper

---

[5] The petitioner's written statements were admitted into evidence.
[6] One of the officers vouchered the duct tape and submitted it to the police laboratory for fingerprint and DNA testing.  (T. Tr. 880.)

extremities; the mechanism of death was loss of blood.  (T. Tr. 1638.)  Sharon died from sharp

force injuries of the head, neck and torso.  (T. Tr. 1654.)

DNA from the material under Sharon's fingernails was a partial match to the petitioner.

Specifically, there was a mixture of DNA, which included Sharon and a male contributor.  (T.

Tr. 1333-34.)  The lab analysis generated a partial profile of the male contributor, identifying the

two alleles on five of 13 loci.  (T. Tr. 1334-35, 1347.)  The petitioner's DNA matched those five

loci.  (T. Tr. 1347.)  That profile would be expected to be found in one of 43 million Asian men.

(*Id.*)  The petitioner's fingerprints were on the flashlight battery and on the core of a roll of duct

tape, as well as on the piece of duct tape used to bind Simon's legs.  (T. Tr. 1525-27.)  His palm

print was on the wall by Simon's bed.  (T. Tr. 1498.)

B.  The Defense Case

Jin Zhan Lin, the petitioner's brother, testified that he shared an apartment with his

brother and mother, and that on May 12, 2005, the petitioner was at the apartment watching

television from about 7:30 p.m. until 11:00 p.m.  (T. Tr. 1682, 1687-88.)

C.  Jury Charge, Initial Verdict and Redeliberation

The jury deliberated on 14 counts:

The first six counts charged different theories of first-degree murder: two counts of

murder in the first degree on the theory that the petitioner killed both victims during the

commission of a burglary, two counts of murder in the first degree on the theory that the

petitioner killed the victims in the course of an attempted robbery, and two counts of murder in

the first degree on the theory that the petitioner killed the victims in the same criminal

transaction.[7]  (T. Tr. 1882-97.)

---

[7] There was one count for each victim.  (T. Tr. 1890-94, 1895-97.)

The seventh through twelfth counts charged the petitioner with different theories of second-degree murder: two counts of intentional murder—one count for each victim—and four counts of felony murder on the theory that the petitioner killed the victims during the course of a burglary and an attempted robbery.  (T. Tr. 1897-1905.)

Finally, the thirteenth and fourteenth counts charged the petitioner with burglary and attempted robbery.  (T. Tr. 1908, 1911.)

In his instructions, the judge noted the overlap between the first- and second-degree murder counts that charged the petitioner with committing the murders during the course of a burglary and an attempted robbery.  (T. Tr. 1905-07.)  The court explained that the prosecutor had to prove that the petitioner intended to kill the victims in order for the jury to convict him of murder in the first degree, but did not have to prove intent to kill for the second-degree murder counts.  (*Id.*)

During deliberations, the jury requested and received trial exhibits, and readback of trial testimony.  (*See* T. Tr. 1919-20, 1922, 1930, 1935.)  The jury also requested and received instructions on the elements of some of the charges.  (T. Tr. 1922, 1934, 1936-50.)

The jury found the petitioner guilty of all but three charges—counts two, four and five.  (T. Tr. 1952-54.)  The court explained that it could not accept the verdicts on counts two, four, five and eight—the intentional murder of Sharon on which the jury convicted—because they were inconsistent.  The court directed the jury to "deliberate on those four counts only and reconsider [its] verdict on those four counts only."  (T. Tr. 1957-58.)  Defense counsel asked that the court instruct the jury to redeliberate on all counts, which the judge denied.  (T. Tr. 1956-58.)

D. <u>Jury Verdict and Sentencing</u>

The jury continued its deliberations on the four counts, and found the petitioner guilty of those counts, in addition to the counts on which it had already returned verdicts. (T. Tr. 1959-62.)

On July 14, 2008, Judge Lasak sentenced the petitioner to concurrent sentences of life without parole on the six first-degree murder counts, 25 years to life on each of counts seven through twelve, 25 years with five years of post-release supervision on count thirteen, and 15 years with five years of post-release supervision on count fourteen. (July 14, 2008 Sentencing Tr. 1-14.)

## PROCEDURAL HISTORY

### I.    **Direct Appeal**

The petitioner, through counsel, appealed his conviction in October 2011. (ECF No. 11 at 1-49.) He challenged the trial court's direction that the jury redeliberate only on four counts, rather than all counts. (*Id.* at 27-32.) He also argued that his statements to detectives should have been suppressed, that the trial judge's refusal to admit the videotape of his interview with an assistant district attorney deprived him of a fair trial, and that the second-degree murder convictions should have been dismissed as lesser included concurrent counts of the first-degree murder convictions. (*Id.* at 32-47.) The prosecution conceded that the second-degree murder convictions should be dismissed, and otherwise opposed. (*Id.* at 50-110.)

On April 3, 2013, the Appellate Division vacated the second-degree murder convictions, but otherwise affirmed the petitioner's conviction. (*Id.* at 111-13.) One judge dissented, opining that the petitioner's statements should have been suppressed. (*Id.* at 113-21.)

That judge granted the petitioner's application for leave to appeal to the New York Court of Appeals on June 13, 2013. (*Id.* at 122, 145.) The petitioner raised the same challenges in the

Court of Appeals that he made in the Appellate Division.  (*Id.* at 146-75; ECF No. 11-1 at 1-73.)

In a February 18, 2016 opinion, the Court of Appeals unanimously affirmed the Appellate

Division's decision.  (ECF No. 11-2 at 103-46.)

## II.   Collateral Challenge

### A.   440.10 Motion

On June 2, 2016, the petitioner moved *pro se* pursuant to C.P.L. § 440.10 to vacate his

conviction.  (ECF No. 11-2 at 147-68.)  He argued that the DNA expert's testimony violated the

Confrontation Clause because the expert did not personally test all the evidence.  (*Id.* at 156-58.)

He also asserted that the prosecution withheld *Brady* material, and that his lawyer should have

called an expert on false confessions.  (*Id.* at 158-59, 163.)  Finally, he argued that his trial

lawyer was ineffective because he did not call a DNA expert at trial.  (*Id.* at 160-63.)

In a September 27, 2016 decision, Judge Lasak denied the motion, finding each claim

procedurally barred.  (ECF No. 11-3 at 26-31.)  The petitioner moved for leave to appeal the

decision, which was denied on July 11, 2017.  (*Id.* at 89.)

### B.   Coram Nobis Petition

On September 25, 2017, the petitioner filed a *pro se coram nobis* petition, in which he

argued that his appellate lawyer was ineffective for failing to raise various challenges on direct

appeal.  (ECF No. 11-3 at 90-155.)

The Appellate Division denied the petition on February 7, 2018, finding that the

petitioner "failed to establish that he was denied the effective assistance of appellate counsel."

(ECF No. 11-4 at 25.)  The Court of Appeals denied the petitioner's application for leave to

appeal on July 18, 2018.  (*Id.* at 43.)

**LEGAL STANDARD**

A federal court reviewing a habeas petition must not "review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  This doctrine applies to substantive and procedural state law grounds. *Id.* at 729-30.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires a federal court reviewing a state prisoner's habeas petition to give deference to a state court's decision on the merits.  28 U.S.C. § 2254(a).  A federal court may not issue a writ of habeas corpus unless the state court's decision on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Johnson v. Williams*, 568 U.S. 289, 292 (2013); *Chrysler v. Guiney*, 806 F.3d 104, 116-17 (2d Cir. 2015).  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

"When a state court" "(1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment," "a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).  For example, "a state court ruling simply that a claim is 'without merit' constitutes an adjudication on the merits of that claim." *Jimenez v. Walker*, 458 F.3d 130, 146 (2d Cir. 2006).  In such a case, "the federal court will focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly

established Supreme Court precedent." *Sellan*, 261 F.3d at 311-12.

For the purposes of federal habeas review, "clearly established law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412-13. The court reviews the last reasoned state court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000). The state court's factual determinations are presumed to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A petitioner can seek federal habeas corpus relief only after he exhausts his state court remedies and gives the state court a fair and full opportunity to review the merits of the claim. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In other words, a petitioner must present "the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

## DISCUSSION

Liberally construed, the petitioner reasserts the claims he made in his 440.10 motion and *coram nobis* petition: that the DNA expert's testimony violated the Confrontation Clause, that the prosecution withheld *Brady* material, that his trial lawyer was ineffective, that a false confessions expert should have testified at trial, and that his appellate counsel was ineffective for failing to raise certain challenges on direct appeal. (ECF No. 1 at 10-11; ECF No. 11-2 at 147-

17

68; ECF No. 11-3 at 90-155.)  He also makes the same arguments he made on direct appeal. (ECF No. 1 at 8, 10-11.)  In addition, he faults the trial court's jury instructions on burglary and intent, and maintains that the indictment was duplicitous and multiplicitous.  (*Id.* at 5, 7.)

## I.      440 Motion Challenges

Judge Lasak denied the petitioner's 440.10 motion, finding each claim "subject to a mandatory procedural bar."  (ECF No. 11-3 at 29.)  New York Criminal Procedure Law Section 440.10(2)(c) requires New York state courts to deny a 440.10 motion when "although sufficient facts appear on the record of the proceeding underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion . . . [the movant] unjustifiabl[y] fail[ed] to raise such ground or issue upon an appeal."  The state court, invoking this procedural rule, concluded that the petitioner's claims were based on facts that appeared on the record, and therefore could have been raised on direct appeal.  (*Id.* at 30.)

Federal habeas courts are not permitted to review a state court claim on which a petitioner defaulted pursuant to an "independent and adequate" state procedural rule.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murden v. Artuz*, 497 F.3d 178, 196 (2d Cir. 2007) (citing *Sweet v. Bennett*, 353 F.3d 135, 140 (2d Cir.2003)) ("[w]here the basis for a claim of ineffective assistance of counsel is well established in the trial record, a state court's reliance on [section 440.10(2)(c)] provides an independent and adequate procedural bar to federal habeas review.").  The petitioner made claims in his 440.10 motion that were based on facts in the trial record.  The fact that trial counsel did not call an expert on false confessions, or a DNA expert, was apparent from the record, and could have been challenged on direct appeal.  Moreover, the petitioner's contention that trial counsel did not consult a DNA expert is belied by the record; counsel told Judge Lasak that he had retained and was consulting a DNA expert.  (T. Tr. 1353, 1366-67.)  The state court rejected these claims as procedurally barred, (ECF No. 11-3 at 29), and habeas review

is prohibited unless the petitioner can establish either cause for and prejudice from the default, or

his actual innocence.  *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994) (citing *Wainwright v.*

*Sykes*, 433 U.S. 72, 87 (1977)); *Gupta v. United States*, 913 F.3d 81, 84 (2d Cir. 2019) (citing

*Murray v. Carrier*, 477 U.S. 478, 485 (1997)).  The petitioner can show neither.

"Actual innocence means factual innocence, not mere legal insufficiency."  *Bousley v.*

*United States*, 523 U.S. 614, 615 (1998).  Nothing in the record supports a claim of actual

innocence.  The petitioner confessed to killing Sharon and Simon, giving the detectives detail

that only the murderer could have known, including, for example, that he had put the murder

weapon in the toilet.  (T. Tr. 1132-33.)  The evidence corroborated the petitioner's confession;

his fingerprints were on the piece of duct tape used to bind Simon's legs, as well as inside the

roll of tape found at the scene.  (T. Tr. 1525-27.)  His DNA was under Sharon's fingernails.  (T.

Tr. 1347.)  Moreover, Simon's blog post put the petitioner in the apartment on May 12, 2005

around the time of the murder.  (ECF No. 11-7 at 240; T. Tr. 1344-47.)  As discussed more fully

in Section II below, the petitioner's complaints about appellate counsel are not persuasive.

Thus, the claims raised in the petitioner's 440 motion do not warrant habeas relief.

## II.    *Coram Nobis* Challenges

As he did in his *pro se coram nobis* petition, the petitioner argues that his appellate

counsel was ineffective because counsel did not make certain challenges on direct appeal.  (ECF

No. 1 at 8; ECF No. 11-3 at 90-155.)  The reviewing state court rejected this claim on the merits,

finding that the petitioner "failed to establish that he was denied the effective assistance of

appellate counsel."  (ECF No. 11-4 at 25.)

This determination was not an unreasonable application of clearly established Supreme

Court precedent.  28 U.S.C. § 2254(d)(1).  *Strickland v. Washington* governs ineffective

assistance of counsel claims, 466 U.S. 668 (1984), including claims that appellate counsel was

ineffective, *see Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985).  To prevail, a petitioner must establish: (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694.

The first prong requires the petitioner to establish that his counsel's performance was "so deficient that, 'in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.'" *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (quoting *Strickland*, 466 U.S. at 690).  This test may be met by showing that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Lynch v. Dolce*, 789 F.3d 303, 311 (2d Cir. 2015) (quoting *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994)).  However, appellate counsel does not have a duty to raise every non-frivolous issue that could be raised. *Jones v. Barnes*, 463 U.S. 745, 754 (1983).

The second prong requires the petitioner to establish that his counsel's "deficient performance prejudiced the defense" such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687, 694.  "A reasonable probability is one that is sufficient to undermine confidence in the outcome, which requires a substantial, not just conceivable, likelihood of a different result." *Jackson v. Conway*, 763 F.3d 115, 153 (2d Cir. 2014) (internal quotation marks and citation omitted).  To establish prejudice from appellate counsel's performance, the "petitioner must show that, had his claim been raised on appeal, there is a reasonable probability that it would have succeeded before the state's highest court." *Dolce*, 789 F.3d at 311 (citing *Claudio v. Scully*, 982 F.2d 798, 805 (2d Cir. 1992)).

As in all ineffective assistance of counsel claims, the court begins with "a strong presumption that counsel's conduct f[ell] within the wide range of professional assistance;" a presumption that the petitioner bears the burden to overcome. *Strickland*, 466 U.S. at 689. Moreover, "[w]hen evaluating an ineffective assistance claim under § 2254(d), [the Court's] review is 'doubly deferential'" because the deferential *Strickland* standard is applied "through the deferential lens of § 2254(d)." *Jackson v. Conway*, 763 F.3d 115, 153 (2d Cir. 2014). In such a case, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

Appellate counsel's representation fell well within the bounds of sound, professional representation. She filed a thorough and well-reasoned 102-page brief, in which she reasonably focused on three issues: the admission of the petitioner's statements, the exclusion of evidence relating to the voluntariness of those statements, and the trial court's response to the jury's initial verdict. (ECF No. 11 at 146-75; ECF No. 11-1 at 1-73.) Indeed, the dissenting judge on the intermediate appellate court agreed with the first two arguments, and granted the petition for leave to appeal to the Court of Appeals. (*See* ECF No. 11 at 113-21.) "[T]he 'process of winnowing out weaker claims on appeal and focusing on those' more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Miller v. Superintendent of Shawangunk Corr. Facility*, No. 18-CV-1762, 2020 WL 4432096, at *15 (S.D.N.Y. July 31, 2020) (quoting *Burger v. Kemp*, 483 U.S. 776, 784 (1987)). "A brief that raises every colorable issue runs the risk of burying good arguments[.]" *Barnes*, 463 U.S. at 753.

The petitioner asserts that appellate counsel should have cited federal precedent in her challenge to the admission of the petitioner's statements at trial. (ECF No. 11-3 at 152.) In fact,

21

counsel invoked *Rogers v. Richmond*, 365 U.S. 534 (1961), *Ashcraft v. Tennessee*, 322 U.S. 143 (1944), *Miranda v. Arizona*, 384 U.S. 436 (1966) and their progeny in challenging the admission of the petitioner's statements at trial.  (*See* ECF No. 11-1 at 27-54.)

The petitioner also faults appellate counsel for omitting the following claims: (a) the indictment was duplicitous and multiplicitous, (b) the exclusion of his family members from the courtroom, (c) that the petitioner was improperly excluded from "in-chambers" portions of *voir dire*, (d) that trial counsel was ineffective, (e) a *Brady* violation and (f) that the prosecution's summation was improper.  (ECF No. 11-3 at 90-155.)  These arguments were not "significant or obvious," nor were they clearly stronger than those that appellate counsel raised.  *Henderson*, 13 F.3d at 533.  Indeed, most of the omitted challenges the petitioner identifies are tenuous, factually unsupported or both.

### a.    Omitted Challenges

#### i.    *Duplicity and Multiplicity*

Appellate counsel's decision not to challenge the indictment as duplicitous or multiplicitous on direct appeal was reasonable.  The claim was not preserved for appellate review, since trial counsel did not raise the objection.  *See Chrysler v. Guiney*, 806 F.3d 104, 119-20 (2d Cir. 2015).  Moreover, appellate counsel raised and briefed thoroughly the petitioner's strongest challenges—the admission of the petitioner's inculpatory statements at trial, and the exclusion of evidence bearing on the admissibility of those statements.

#### ii.    *Public Trial*

The petitioner claims that his family members were excluded from the courtroom during *voir dire* and trial, and appellate counsel should have raised a Sixth Amendment challenge on this basis.  (ECF No. 11-3 at 128-32.)  Appellate counsel's decision to omit this claim on direct appeal was not unreasonable under *Strickland*.  First, it is not clear from the record that the

petitioner's family members were excluded from the courtroom.  In the portion of the trial transcript the petitioner cites, the court denied the prosecutor's request that the petitioner's mother leave the courtroom because she was listed as an alibi witness.  (T. Tr. 85-86.)  To the extent the petitioner's family members were excluded for some period during jury selection, trial counsel did not object or make a record.  Thus, the claim was not preserved.  As discussed above, it was reasonable for appellate counsel to omit an unpreserved claim.

### iii.      Right to Be Present at Material Stages of Trial

The petitioner also claims that his appellate lawyer should have argued that the petitioner was improperly excluded from "in-chambers" portions of *voir dire*.  (*Id.* at 133-37.)  In his *coram nobis* petition, the petitioner claimed that he was not challenging the side bar conferences during jury selection; instead, he challenged "the numerous 'in-chambers' conference[s] where . . . all the challenges were executed by both sides in order to complete the selection of the entire panel of jurors in this case occurred."  (ECF No. 11-3 at 134.)  As an initial matter, the petitioner waived his right to be present at sidebar conferences with prospective jurors.  (T. Tr. 84-85.)  In any event, nothing in the record supports the petitioner's claim that there were "in-chambers" conferences.  Accordingly, counsel's decision not to make this claim was reasonable.

### iv.      Ineffective Assistance of Trial Counsel

According to the petitioner, his appellate counsel should have argued that trial counsel was ineffective because he did not make a Confrontation Clause challenge to the testimony of DNA expert Robert Hindle, object to the court's response to jury notes, object to the jury instructions on intent and burglary, or request a "transitional instruction" in the jury charge. (ECF No. 11-3 at 138-50.)  Appellate counsel's decision not to make these claims was reasonable, especially given trial counsel's strategic choices.

The admission of the DNA expert's testimony was not a clear or obvious ground for direct appeal.  The expert, Robert Hindle, testified that the lab tested material from underneath Sharon's fingernails and duct tape for the presence of DNA, that they compared this with the DNA found on the butt of a cigarette the petitioner smoked, and concluded that the DNA was the same.[8]  (T. Tr. 1277-1348.)  He also testified that he did not personally conduct any of the testing, but "may have been involved in some of the reviewing of the data."  (T. Tr. 1563.)

The quality of an attorney's representation is evaluated based on the law and circumstances at the time of the representation.  *People v. Baldi*, 54 N.Y.2d 137, 147 (1981) ("So long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met."); *Strickland*, 104 U.S. at 689 ("[A] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").  In *People v. John*, 27 N.Y.3d 294 (2016), the Court of Appeals held that DNA lab reports summarizing the results of DNA testing were testimonial.  The petitioner claims that appellate counsel should have made the same argument on direct appeal.  (ECF No. 11-3 at 138-41.)  But *John* was decided in 2016—years after the petitioner's trial, and three years after the Appellate Division affirmed his conviction. Before *John*, it was reasonable to assume that DNA reports, like those about which the expert testified, were non-testimonial under New York Law.  *See People v. Brown*, 13 N.Y.3d 332, 340 (2009) (finding DNA report nontestimonial because it consisted of machine-generated raw data,

---

[8] Specifically, Mr. Hindle testified that one could expect to find the partial DNA profile under Sharon's fingernails in one of 43 million Asian males.  (T. Tr. 1347.)

graphs and charts representing the characteristics of DNA).  In any event, neither *John* nor
governing federal precedent requires every analyst who played any role in processing DNA
evidence be called as a witness.  *Id.* at 312 ("[A]n 'all analysts' rule is not consistent with the
decisional law."); *Washington v. Griffin*, 876 F.3d 395, 407 (2d Cir. 2017) ("[T]he Supreme
Court has never held that the Confrontation Clause requires an opportunity to cross examine each
lab analyst involved in the process of generating a DNA profile and comparing it with another.").

     Nor was appellate counsel ineffective for failing to challenge the trial court's response to
jury notes.  In fact, the basis of the petitioner's claim is not clear.  He was present when the trial
court discussed the notes with the parties and responded to them.  (Tr. 1919, 1921, 1930, 1935.)
To the extent the petitioner challenges the procedure by which trial exhibits were shown to the
jury, he does not identify a cognizable claim under applicable state law.  *See* C.P.L.
§§ 310.10(1), 310.20(1).  A jury is entitled to take trial exhibits into the deliberation room
(Section 310.20) and court officers are permitted, with the trial court's authorization, to "speak to
the jurors about a variety of ministerial matters."  *People v. Bonaparte*, 78 N.Y.2d 26, 30 (1991)
(citing C.P.L. § 310.10(1)).  Nor does the record support the petitioner's claim that the jury may
have accidentally been "provided other photographs that were no[t] supposed to have been seen."
(ECF No. 11-3 at 145.)  Thus, it was not ineffective assistance for appellate counsel to omit this
challenge on direct appeal.

     The petitioner also faults appellate counsel for not raising a challenge to the court's jury
instructions.  Like his claim about the jury notes, it is not clear what the petitioner thinks the trial
court did wrong.  Liberally construed, the petitioner challenges the trial court's instructions on
burglary and intent.  First, trial counsel did not object to the charge, so the Appellate Division
could have decided the merits of the challenge only by exercising its interest-of-justice

jurisdiction.  As explained above, it was not ineffective for appellate counsel to omit an unpreserved challenge.

In any event, there is no merit to the petitioner's claims.  Citing *People v. Graves*, 76 N.Y.2d 16 (1990), the petitioner argues that the trial court's burglary instruction was improper. In *Graves*, the trial court gave the following instruction: "to remain in a dwelling, regardless of how you entered it, because you have the intent to commit a crime is remaining unlawfully."  *Id.* at 19.  The Court of Appeals determined that this instruction improperly merged the elements of intent and unlawful entry.  Judge Lasak, on the other hand, explained that to find the petitioner guilty of burglary in the first degree, the jury had to determine that each of the following elements was established beyond a reasonable doubt: (i) that the petitioner unlawfully remained in the dwelling, and (ii) that the petitioner did so with the intent to commit a crime inside the dwelling.  (T. Tr. 1908.)  Judge Lasak also explained that a "person remains unlawfully in a dwelling when that person has no license or privilege to remain in that dwelling.  To have no license or privilege to remain means to have no right, permission or authority to do so."  (T. Tr. 1908.)  These were correct statements of the law, and included none of the erroneous language in *Graves*.  Judge Lasak's definition of "intent"—as "conscious objective or purpose,"—was also correct.  (T. Tr. 1882); *see People v. Miller*, 87 N.Y.2d 211, 217 (1995) (defining "intent" as a "conscious objective").  Appellate counsel cannot be faulted for failing to make a meritless claim.[9]

---

[9] It is correct, as the petitioner argues, that the first-degree felony murder counts and the corresponding second-degree felony murder counts should have been submitted to the jury in the alternative.  C.P.L. §§ 300.40, 300.50.  However, counsel raised that claim on direct appeal, the government conceded, (ECF No. 11 at 45-47, 108-09), and the Appellate Division vacated the second-degree felony murder convictions.  (*Id.* at 113.)  The petitioner also contends that appellate counsel, by arguing that the second-degree felony murder counts were "inclusory concurrent counts," forewent the "much stronger" double jeopardy challenge.  (ECF No. 11-3 at 148.)  But by prevailing on the concurrent counts arguments, which the petitioner did on direct appeal, he secured the same relief to which he would have

### v.    *Brady Violation*

The petitioner also claims that appellate counsel should have argued that the prosecution withheld *Brady* material.  At trial, counsel suggested that the prosecution had not turned over evidence that DNA testing revealed the presence of a third person's DNA under Sharon's fingernails.  (T. Tr. 1355.)  The record does not support that claim.  (*See* T. Tr. 1350-1486.) What the evidence did show was that the lab did not test all of the submitted evidence for the presence of DNA, which defense counsel knew from the records the prosecution provided.  (*See id.*)  The facts did not support a cognizable *Brady* claim on appeal.

### vi.    *Prosecutor's Summation*

Next, the petitioner argued that the prosecutor repeatedly "vouched" for the credibility of witnesses.  (ECF No. 11-3 at 151-52.)  Counsel made no such objection at trial, so the claim, even if meritorious, was not preserved.  But there was no basis for objection.  Of course, prosecutors should not personally vouch for a witness' credibility.  *United States v. Newton*, 369 F.3d 659, 681 (2d Cir. 2004) (citing *United States v. Young*, 470 U.S. 1, 18-19 (1985)).  The prosecutor in this case did not violate that rule.  (*See* T. Tr. 1803-51.)  While she described the alibi testimony of the petitioner's brother as "not credible" and "not worthy of your belief," she did so by comparing his testimony to other evidence in the record, which was entirely proper. (T. Tr. 1807-08); *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998) ("[W]hat might superficially appear to be improper vouching for witness credibility may turn out on closer examination to be permissible reference to the evidence in the case.").  Accordingly, there is no basis for an ineffective assistance of appellate counsel claim.

---

been entitled had he won a double jeopardy claim—dismissal of the convictions on each of the second-degree felony murder counts.

###### b.      Underlying Claims

To the extent the petitioner raises the claims underlying the ineffective assistance claim—duplicity and multiplicity, Sixth Amendment challenges, the ineffectiveness of trial counsel and the supposedly improper summation claim—the claims are technically exhausted but procedurally barred.  *Bossett v. Walker*, 41 F.3d 825, 828-29 (2d Cir. 1994); 28 U.S.C. § 2254(b).[10]  Thus, these claims can be reviewed only if there was cause for the default and prejudice to the petitioner, *Bossett*, 41 F.3d at 829 (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)), or if he can establish that he is "actually innocent," *Gupta v. United States*, 913 F.3d at 84 (citing *Murray v. Carrier*, 477 U.S. 478, 485 (1997)).  "Cause may be demonstrated with 'a showing that . . . the procedural default is the result of ineffective assistance of counsel.'" *Bossett*, 41 F.3d at 829 (quoting *Murray*, 477 U.S. at 488).  But as explained above, the petitioner has not established that the procedural default was the result of an ineffective lawyer. Nor can the petitioner plausibly contend that he is actually innocent given the strength of evidence against him.

### III.    Jury Instructions, Duplicity and Multiplicity

The petitioner challenges the trial court's jury charge on burglary and intent, and also argues that the indictment was duplicitous and multiplicitous.  (ECF No. 1 at 5-7.)  He further asserts that his trial counsel should have objected to the instructions and to the indictment, and

---

[10] Except for the purported *Brady* and Confrontation Clause claims, the petitioner raised these underlying claims for the first time in his *coram nobis* petition as bases for his claim that appellate counsel was ineffective.  (*See* ECF No. 11 at 1-49, 146-75; ECF No. 11-1 at 1-73; ECF No. 11-3 at 145-50.)  The petitioner raised the *Brady* and Confrontation Clause challenges for the first time in his 440.10 motion. As explained in Section I, those claims were denied pursuant to an independent and adequate state procedural rule.  As discussed above, the petitioner has not shown that his lawyers were ineffective because they did not raise these claims, so he cannot overcome the procedural default.

that his appellate counsel provided ineffective assistance by failing to raise trial counsel's supposed errors on direct appeal.  (*Id.*)

The underlying claims—the challenge to the trial court's jury instructions and to the indictment—are technically exhausted but procedurally barred.  *Bossett*, 41 F.3d at 828-29; 28 U.S.C. § 2254(b).  The petitioner did not make these challenges on direct appeal.  (*See* ECF No. 11 at 1-49, 146-75; ECF No. 11-1 at 1-73.)  He raised them for the first time in his *coram nobis* petition as bases for his claim that appellate counsel was ineffective.  (ECF No. 11-3 at 145-50.) Thus, the claims can be reviewed only if there was cause for the default and prejudice to the petitioner, *Bossett*, 41 F.3d at 829 (citing *Wainwright*, 433 U.S. at 87), or if he can establish that he is "actually innocent," *Gupta*, 913 F.3d at 84 (citing *Murray*, 477 U.S. at 485).

As explained above, the petitioner has not established cause or prejudice.  His appellate lawyer was not ineffective, and as discussed in Section II.a.iv, Judge Lasak's instructions on burglary and intent were correct.  Thus, this challenge does not warrant habeas relief.

## IV.    Inculpatory Statements

The petitioner challenges the hearing court's determination, affirmed by the New York Court of Appeals, that his statements to detectives were admissible.  (ECF No. 11-1 at 27-54; ECF No. 11-2 at 103-46.)  The Court of Appeals, applying *Miranda* and relevant state precedents, determined that the petitioner's statements were voluntary, that he was not in custody before May 14, 2005, and that his *Miranda* waiver on May 14 was knowing, intelligent and voluntary.  (ECF No. 11-2 at 127-41.)

This decision was not an unreasonable application of clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented to the state court.  28 U.S.C. § 2254(d); *see Miranda*, 384 U.S. 436.  Custody within the meaning of *Miranda* is determined by an objective test comprising "[t]wo discrete inquiries

. . . : (1) the circumstances surrounding the interrogation, and (2) given those circumstances, whether a reasonable person would have felt free to terminate the interrogation and leave." *Yarborough v. Alvarado*, 541 U.S. 652, 653 (2004) (citing *Thompson v. Keohane*, 516 U.S. 99 (1995)).  A statement is involuntary if "obtained by 'techniques and methods offensive to due process' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'"  *United States v. Santiago*, 720 F. Supp. 2d 245, 252 (W.D.N.Y. 2010) (quoting *Oregon v. Elstad*, 470 U.S. 298, 304 (1985)).  Whether a *Miranda* waiver is voluntary is measured by the same standards—the presence or absence of coercion.  *See Colorado v. Spring*, 479 U.S. 564, 573-74 (1987).  A *Miranda* waiver is knowing and intelligent if the petitioner "understood that he had the right to remain silent and that anything he said could be used as evidence against him."  *Id.* at 574.

Given this framework, the Court of Appeals reasonably determined, based on the hearing court's factual findings—which were entitled to a presumption of correctness, 28 U.S.C. § 2254(e)(1)—that the petitioner was not in custody on the first day he was questioned because he was questioned intermittently, provided breaks during which he could sleep, given food and drinks, and was permitted to use the bathroom and smoke cigarettes.  (ECF No. 11-2 at 138.)  He also went home after the first day of questioning.  (ECF No 11-5 at 181, 185-86.)  Moreover, the Court of Appeals' determination that the petitioner knowingly, intelligently and voluntarily waived his rights, even though English is his second language, was reasonable; the hearing court found that the interviewing detectives communicated with the petitioner in English, that during an earlier arrest, the petitioner was advised of his rights and waived those rights, and that he communicated in English during pretrial detention and his CJA intake interview.  (ECF No. 11-2 at 140.)

## V.    Evidentiary Challenges

The petitioner challenges the trial court's exclusion of two pieces of evidence—the videorecording of the petitioner invoking his *Miranda* rights on May 16, 2005, and notes he made while being questioned.

Generally, purported violations of state evidence rules are not cognizable grounds for habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  However, under Supreme Court precedent, criminal defendants are "entitled by the Constitution to a meaningful opportunity to present a complete defense." *Wade v. Mantello*, 333 F.3d 51, 57 (2d Cir. 2003).  This right "is not unlimited, but rather[,] is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998).  "State and federal rules of procedure and evidence 'designed to assure both fairness and reliability in the ascertainment of guilt and innocence' are central among these restrictions." *Hunter v. Murphy*, 303 F. Supp. 2d 59, 67 (D. Conn. 2003) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973)).  Indeed, "[t]he power of courts to exclude evidence through the application of evidentiary rules that serve the interests of fairness and reliability is well-settled." *Wade*, 333 F.3d at 57-58.  Such rules do not violate an accused's right to present a defense "so long as they are not arbitrary or disproportionate to the purpose they are designed to serve." *Scheffer*, 523 U.S. at 308.

"In considering whether the exclusion of evidence violated a criminal defendant's right to present a complete defense, [the court] start[s] with 'the propriety of the trial court's evidentiary ruling.'" *Hawkins v. Costello*, 460 F.3d 238, 244 (2d Cir. 2006) (quoting *Wade*, 333 F.3d at 59; citing *Washington v. Schriver*, 255 F.3d 45, 57 (2d Cir. 2001)).  If evidence was correctly excluded pursuant to a state evidentiary rule, the court considers whether the rule is arbitrary or disproportionate to the purposes it is designed to serve. *Id.* (citing *Scheffer*, 523 U.S. at 308).  A

state evidentiary rule is "unconstitutionally arbitrary or disproportionate only where it has

infringed upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308.

### a.      Videorecording

On May 16, 2005, an assistant district attorney arrived at the precinct to do a videotaped

interview of the petitioner after he made written statements to detectives.  (ECF No. 11-5 at 250-

51.)  As the prosecutor advised the petitioner of his rights, the petitioner sought clarification

about the meaning of "attorney" and "remain silent," and then asked for a lawyer.  (*Id.*; *see* ECF

No. 11-1 at 8-9.)  At that point, the prosecutor stopped the interview.  (ECF No. 11-5 at 250-51.)

Defense counsel moved to admit the videorecording, arguing that it was relevant to the

voluntariness of the petitioner's statements because it showed his physical appearance on May

16, 2005.  (T. Tr. 18, 26-28, 943-44.)  The trial court denied the application, finding that the

recording was hearsay, but permitted counsel to introduce a still photograph from that video;

counsel rejected that alternative.  (T. Tr. 395, 946-48.)  Notably, defense counsel made it clear

that he was not seeking to admit the video as evidence of the petitioner's ability to speak and

understand English.  (T. Tr. 23-26.)  The New York Court of Appeals affirmed, finding that the

trial judge properly excluded the recording as hearsay, and because it was potentially confusing.

(ECF No. 11-2 at 141-43.)

The trial court's decision to exclude the videotape, affirmed by the Court of Appeals, was

a sound application of state evidentiary rules prohibiting hearsay.  *Nucci ex rel. Nucci v. Proper*,

95 N.Y.2d 597, 602 (2001).  Moreover, the court accommodated defense counsel's stated

concern—demonstrating the petitioner's appearance—by permitting counsel to introduce a still

photograph from the recording.  In any event, it was within the trial court's discretion to exclude

even relevant evidence if it was unduly prejudicial or inclined to confuse or mislead the jury.

*People v. Primo*, 96 N.Y.2d 351, 355 (2001).  The trial judge's ruling excluded potentially

confusing evidence while permitting a version of the evidence more tailored to defense counsel's proffer.

**b.    Petitioner's Notes**

In the immediate aftermath of the murders, detectives questioned an array of witnesses, including the petitioner, who was not initially a suspect.  (*See* ECF No. 11-5 at 56-57.)  At one point during the questioning, the petitioner wrote notes in Cantonese.  (ECF No. 11-8 at 143-44.)  Among other things, he wrote, "I was imprisoned for the whole day.  For the whole day.  That is how American police do.  Freedom have not but say have.  Yes but say no.  No but say yes.  He who is involved laughs so loudly, but he who not involved is harassed."  (ECF No. 11-8 at 143-44.)  He also wrote, "Everyone say it is I.  Do I look like a murderer?  Will anyone help me?  Heaven and earth help.  Everyone helps.  Is not helping me.  Okay.  Okay."  (*Id.* at 146.)  Defense counsel moved to admit these as present sense impressions, evidence of the petitioner's state of mind and of the involuntariness of his statements.  (*Id.* at 143-58.)  The trial court denied the application, ruling that the statements were hearsay.  (*Id.* at 159.)  The New York Court of Appeals affirmed the trial court's ruling, agreeing that the statements were hearsay.  (ECF No. 11-2 at 143-44.)

The trial court's decision, affirmed by New York's highest court, did not violate the Constitution.  In fact, the statements were properly excluded as hearsay.  *Proper*, 95 N.Y.2d at 602.  The statements did not fall into any recognized exception.  *See People v. Alex*, 260 N.Y. 425 (1933); *People v. Vasquez*, 88 N.Y.2d 561, 574 (1996) ("[p]resent sense impressions" are "descriptions of events made by a person who is perceiving the event as it is unfolding").  Rather, they were self-serving statements, inadmissible under New York law.  *People v. Haddock*, 917 N.Y.S.2d 634, 635 (2010); *see also People v. Reynoso*, 73 N.Y.2d 816, 819 (1988).

## VI.     Verdict

After closing arguments, the trial court submitted 14 counts to the jury, and defined the elements of each: six first-degree murder counts—two counts on the theory that the petitioner killed the victims during the commission of a burglary, two counts on the theory that the petitioner killed the victims in the course of an attempted robbery, and two counts on the theory that the petitioner killed the victims in the same criminal transaction (one count for each victim), (T. Tr. 1882-97); six second-degree murder counts—two counts of intentional murder (one count for each victim) and four counts of felony murder, each on the theory that the petitioner killed the victims during the course of a burglary or an attempted robbery, (T. Tr. 1897-1905).  Finally, the thirteenth and fourteenth counts charged the petitioner with burglary and attempted robbery. (T. Tr. 1908, 1911.)

The jury returned a verdict finding the petitioner guilty of all counts except for counts two, four and five—first-degree murder of Simon during the commission of a burglary (count two), first-degree murder of Simon during the commission of an attempted robbery (count four) and first-degree murder on the theory that the petitioner killed Sharon as part of the same criminal transaction in which Simon was killed (count five).  (T. Tr. 1882-92, 1952-54.)  Count eight, on which the jury convicted, charged the petitioner with the intentional murder of Simon. (T. Tr. 1900.)  The court explained that it could not accept the verdicts on counts two, four, five and eight because they were inconsistent.  (T. Tr. 1957-58.)  He directed the jury to "deliberate on those four counts only and reconsider [its] verdict on those four counts only."  (T. Tr. 1958.) After redeliberating, the jury returned a verdict finding the petitioner guilty of all 14 counts.  (T. Tr. 1959-62.)

On direct appeal, the petitioner challenged the jury's initial verdict as repugnant, and argued that the trial court's direction to the jury to deliberate only on counts two, four, five and

eight, rather than all fourteen counts, violated federal and state law.[11]  (ECF No. 11-1 at 64-72.)

The New York Court of Appeals rejected the challenge as unpreserved, finding that counsel had

not registered a sufficiently specific objection to the court's procedure.  (ECF No. 11-2 at 145

(The petitioner's "argument that the court impermissibly communicated its view of the evidence

is essentially a challenge to the court's instructions to the jury.  However, defense counsel did

not object to that instruction, and therefore the argument is unpreserved.").)

        As explained earlier, federal habeas courts are not permitted to review claims that were

defaulted in state court pursuant to an "independent and adequate" state procedural rule.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Here, the state court rejected the petitioner's

claims as procedurally barred; thus, habeas relief is prohibited unless the petitioner can establish

either cause for and prejudice from the default, or his actual innocence.  *Bossett*, 41 F.3d at 829

(citing *Wainwright*, 433 U.S. at 87); *Gupta*, 913 F.3d at 84 (citing *Murray*, 477 U.S. at 485).

The petitioner cannot establish either.

        In any event, the petitioner's claim is meritless.  "Where an error in a jury instruction is

alleged, it must be established not merely that the instruction is undesirable, erroneous, or even

universally condemned, but that it violated some right which was guaranteed to the defendant by

the Fourteenth Amendment. . . . The question is not whether the trial court gave a faulty

instruction, but rather whether the ailing instruction by itself so infected the entire trial that the

resulting conviction violates due process."  *Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001)

(internal quotation marks and citation omitted).  Whether an instruction violates Due Process

---

[11] The Appellate Division did not address this claim directly, ruling simply that the petitioner's
  "remaining contentions are without merit."  (ECF No. 11 at 113.)

"hinges on whether it tends to coerce undecided jurors into reaching a verdict." *Tavarez v. Larkin*, 814 F.3d 644, 651 (2d Cir. 2016). The trial court's direction to the jury was not coercive.

The jury first announced that it found the petitioner guilty of all counts except for three—first-degree murder of Simon during the commission of a burglary (count two), first-degree murder of Simon during the commission of an attempted robbery (count four) and first-degree murder on the theory that the petitioner killed Sharon as part of the same criminal transaction in which Simon was killed (count five). (T. Tr. 1882-92, 1952-54.) In a conference with the parties, Judge Lasak said that the verdict was inconsistent with the verdict on count eight—the intentional murder of Simon—and that he would instruct the jury to redeliberate on counts two, four, five and eight. (T. Tr. 1955-56.) Defense counsel objected, arguing that the jury should "redeliberate on all of the 14 counts and come out with an appropriate verdict." (T. Tr. 1956.) Judge Lasak denied counsel's request, and instructed the jury: "I'm going to direct you to go back to the jury room because I can't accept the verdict on those four counts only. I direct you to deliberate on those four counts only and reconsider your verdict on those four counts only." (T. Tr. 1958.)

The court's response to the jury's initial verdict did not violate due process. The court did not force the jury to return a "guilty" verdict on any of the redeliberated counts. On the contrary, the jury was free to find that the petitioner was "not guilty" of those counts by finding that the petitioner did not intend to cause Simon's death, a finding that would not have been inconsistent with the other counts not submitted for redeliberation. *Cf. Davis*, 270 F.3d at 132 (finding erroneous jury instruction violated Due Process when "[t]he effect of the error was catastrophic."); *United States v. Assi*, 748 F.2d 62, 68 (2d Cir. 1984) (finding trial court's instructions unconstitutionally coercive where judge told jury that, "If it did not reach a verdict

by '10:30 or close to 11:00,'" the jurors "would be driven home, only to return the next morning," and stating, "It is as simple as that. There has to be a verdict.").

Thus, habeas relief is not warranted.

**CONCLUSION**

The petition for writ of habeas corpus is denied.  The case is dismissed.  A certificate of appealability will not be issued.  *See* 28 U.S.C. § 2253(c).


**SO ORDERED.**

s/Ann M. Donnelly

ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
      December 1, 2021